**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

UNITED STATES OF AMERICA,

                Plaintiff,

v.                                     CRIMINAL ACTION NO. 2:12-cr-00120

MARK DAVIS,

                Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending is Defendant's motion to suppress and to dismiss portions of his indictment [Docket 19]. The United States filed its response on September 18, 2012 (Docket 32). On September 24, 2012, the Court heard evidence and argument on Defendant's motion. Thereafter, the parties filed supplemental briefing (Docket 49, 50). On November 28, 2012, Defendant filed a motion to continue the December 4, 2012, trial of this case [Docket 56]. For the reasons that follow, the Court **DENIES** both motions.

## I.  BACKGROUND

On April 30, 2012, at about 10:00 a.m., a three-man United States Marshal Service fugitive task force arrested Defendant in his Rand, West Virginia home pursuant to a misdemeanor arrest warrant issued from the District of South Carolina.[1] The basis for the arrest was Defendant's failure to pay fines and fees assessed in connection with Defendant's misdemeanor convictions for trespassing on and theft of artifacts from a national wildlife refuge.

---

1  The facts, mostly uncontested, are drawn from evidence presented at the September 24, 2012, pre-trial motions hearing.

Prior to making the arrest, United States Deputy Marshal William Seckman received background information concerning Defendant. This information included a photograph of Defendant, a description of his physical characteristics and his car, and possible home addresses associated with Defendant. Seckman also learned that Defendant had a prior criminal history involving acts of violence and drugs, that is, a felonious assault conviction and domestic violence, drug, and weapons arrests. The lead report from South Carolina warned arresting officers that Defendant was "confrontational" and that he had surveillance cameras posted in the driveway of his South Carolina home. (Docket 11-1 at 1.)

With this background information, Deputy Marshal Seckman went to an address in Rand, West Virginia, where Defendant was believed to be residing. Seckman was accompanied by United States Deputy Marshal Matthew Ingram and Kanawha County Sheriff's Office Deputy J.M. Launi, a member of the United States Marshals Service fugitive task force. Upon their arrival, the officers observed a vehicle in the driveway matching the description they had been given of Defendant's car. Seckman and Ingram then went to the front door of the small, single-story house while Deputy Launi posted around the rear to guard the back door. As they approached the door, Seckman noticed a surveillance camera mounted in the window to the right of the front door. The front door had a window in the upper half of the door equipped with a set of metal venetian blinds on the inside. The blinds were closed, obscuring the Marshals' view into the interior of the house. The frame of the doorway was fitted with a screen door that was locked. Deputy Marshal Seckman blocked the lens of the surveillance camera while Ingram knocked on the door. Defendant came to the door and peeked through the blinds. Ingram and Seckman, recognizing Defendant from the photograph supplied by the South Carolina authorities, identified

themselves, told Defendant they had a warrant for his arrest, and ordered him to open the door. Defendant said he could not open the door.   Ingram and Seckman once again instructed Defendant to open the door, and Defendant again stated he could not.   Deputy Marshal Seckman testified that he observed Defendant backing away from the door, so he left Ingram, jumped off the porch, and ran around to the rear of the house where Launi was waiting.   Ingram then—for the third time—yelled for Defendant to open the door.   This time Defendant explained he needed to get a key to open the deadbolt lock and disappeared into the interior of the house.[2]

Ingram yelled out to warn Seckman and Launi that he could no longer see Defendant. Ingram then heard the back door being kicked in and then heard Seckman twice announce "Marshals.   Put your hands up and get down on the ground." (Docket 51 at 69.) Contemporaneously, Ingram forced entry through the front door and entered into a small living room, just as Launi was handcuffing Defendant, who was at that point lying on the floor.   The arrest took place about five or six feet from the front door and in an area that was in or adjacent to the central interior hallway of the house. Seckman was standing near Defendant's head with his weapon drawn.

The interior of Defendant's house was very small and consisted of a four-square floor plan with a small, central interior hallway.   The front two rooms were the living room, on the right, and a small bedroom, on the left.   Defendant's bedroom and the kitchen comprised the back quadrants of the house.   The interior hallway, which was at or immediately adjacent to the place where Defendant was arrested, opened into four of the five rooms in the house, that is, the front bedroom,

---

2  Seckman testified that he ran around to the rear of the house because Defendant was backing away from the door.   Ingram testified that he continued to speak with Defendant after Seckman had left.   Defendant then backed away from the door after he told Ingram that he had to get the key to open the door.

the living room, the bathroom, and Defendant's bedroom in the left rear of the house.   As Launi and Seckman were securing Defendant, Ingram looked down the hallway and spotted a rifle prominently propped up on a heater in the rear bedroom.[3]   The rear bedroom was approximately seven feet away from where Defendant lay handcuffed.

With his weapon drawn, Ingram entered the rear bedroom.   After ensuring that no one else was in the room, Ingram examined the rifle.   It was an AR-15, fully loaded assault rifle fitted with a large, unsheathed knife bayonet.   Ingram unloaded the rifle and set it back down.   He then turned to do a protective sweep of the rest of the house to "clear it of any other persons." (*Id.* at 70.) As he turned to leave the room, however, he noticed a handgun nestled on a shelf in the headboard of Defendant's bed next to a pillow.   That gun, too, was loaded.   Ingram unloaded it, left the back bedroom, "cleared" the bathroom, and, along with Deputy Launi, who also had his weapon drawn, entered the front bedroom.   Finding nobody, Ingram and Launi opened the closet, saw a locked gun safe and a bulletproof vest or so-called "body armor," and they yelled out to Seckman what they had found.   With all rooms cleared, Seckman advised the officers that they would obtain a search warrant.   From the time the officers first knocked on the front door to the point they decided to obtain the search warrant was five minutes.     The protective "sweep" was completed in "a couple of minutes." (*Id.* at 61.)

---

3  Deputy Marshal Seckman testified at the suppression hearing on direct examination that as Deputy Launi was handcuffing Defendant, he (Seckman) looked back over his right shoulder and saw an assault rifle and pointed it out to Ingram and Launi.   (Docket 51 at 27.)   On cross-examination, Seckman was questioned about his former testimony at the detention hearing on this point.   There, Seckman testified that it was Ingram who brought the assault weapon to his attention.   (Docket 49-1 at 3.)   Seckman explained during the suppression hearing, however, that he thought he had pointed out the assault rifle to Ingram and Launi, but that it was possible that he noticed the rifle at the same time the others did.   (Docket 51 at 82.)   This discrepancy is insignificant.

Upon receipt of the search warrant, the officers opened the safe and found four more rifles, a shotgun, and another pistol.  On May 22, 2012, a federal grand jury returned a two count indictment charging Defendant with violations of 18 U.S.C. §§ 922(g) and 924(a)(2), felon-in-possession (Count One); and 18 U.S.C. §§ 931 and 924(a)(7), felon-in-possession of body armor (Count Two).

## II.    DISCUSSION

Defendant moves to suppress the firearms and body armor (*i.e.* the bulletproof vest) seized from his house on the grounds that the evidence was seized in violation of his Fourth Amendment rights.   He argues that, in the event this evidence is suppressed, the indictment against him must be dismissed because the United States will not be able to prove the crimes charged.   (Docket 19.) In the same motion, he also seeks dismissal of Count Two, arguing that the body armor statute infringes "upon his fundamental right to self-defense in his own home" under the Second Amendment, is unconstitutionally vague in violation of his Fifth Amendment due process rights, and violates the Commerce Clause.   (*Id.* at 1-2.)

For the reasons that follow, the Court rejects each of these contentions.

### A.  *Motion to Suppress Evidence of Firearms and Body Armor*

Defendant contends that evidence of the firearms and the body armor seized from his house should be suppressed because the law enforcement officers "performed an untimely 'protective sweep.' "   (*Id.* at 4.)   He reasons that, because he was handcuffed and subdued at the time of the sweep, he posed no risk to the officers' safety and, thus, there was no need for a protective search of the premises. (*Id.*)   He contends that *United States v. Laudermilt*, 677 F.3d 605, 610 (4th Cir. 2012) stands for the proposition that "a protective sweep may last no longer than is needed to

*arrest the suspect and leave the premises.*" (Docket 19 at 3.) (emphasis added by Defendant).   He further argues that, because the officers "obtained a search warrant based on matters observed through the protective sweep," all evidence seized pursuant to the search warrant should be suppressed.   (*Id.* at 4.)   He contends that without evidence of the firearms and the bulletproof vest, the United States cannot prove the crimes charged and Counts One and Two necessarily must be dismissed.   (*Id.* at 4.)

The United States responds that, because the officers were lawfully present at the time they arrested Defendant and because the assault rifle was in plain view at the time of the arrest, the officers had probable cause to obtain a search warrant for the remainder of the house.   (Docket 32 at 5.)   Additionally, the United States argues that incident to Defendant's arrest, the officers were entitled to look in all areas immediately adjoining the place of arrest from which an attack could be mounted and could lawfully make such a protective sweep without probable cause or reasonable suspicion that their safety was in jeopardy.   (*Id.* at 6.)   As a fallback position, the United States contends that even if the protective sweep were improper, the officers would have inevitably discovered the firearms in the safe and the bulletproof vest because they had probable cause to obtain a search warrant based on the assault rifle being in plain view.   (*Id.* at 9.)

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "It is a 'basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.' " *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (quoting *Groh v. Ramirez*, 540 U.S. 551, 559 (2004)).   Nonetheless, this "presumption may be overcome in some circumstances because the ultimate touchstone of the Fourth Amendment is

'reasonableness.' " *Kentucky v. King*, ___ U.S. ___, 131 S.Ct. 1849, 1856 (2011) (internal quotation marks and alteration omitted).

There are several well-settled exceptions to the warrant requirement.  For example, "the plain-view doctrine authorizes warrantless seizures of incriminating evidence when (1) the officer is lawfully in a place from which the object may be plainly viewed; (2) the officer has a lawful right of access to the object itself; and (3) the object's incriminating character is immediately apparent." *United States v. Jackson*, 131 F.3d 1105, 1109 (4th Cir. 1997) (citing *Horton v. California*, 496 U.S. 128, 136–37 (1990)); *United States v. Williams*, 41 F.3d 192, 196 (4th Cir. 1994).

Another exception is the "protective sweep" rule under *Maryland v. Buie*, 494 U.S. 325 (1990).  *See also Laudermilt*, 677 F.3d at 610; *United States v. Jones*, 667 F.3d 477, 482 (4th Cir. 2012).  As an incident to an arrest, officers may "as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." 494 U.S. at 334.  When police officers make an arrest at a home, they are entitled to perform a further "protective sweep" of the house when they have "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Buie*, 494 U.S. at 334.  "This standard is an extension of the doctrine that permits a police officer to pat down an individual for concealed weapons upon a reasonable suspicion that the individual might be armed, provided that the officer's belief is grounded in 'specific and articulable facts.' " *United States v. Martins*, 413

F.3d 139, 149 (1st Cir. 2005) (quoting *Buie*, 494 U.S. at 331-32 (internal quotation marks omitted)).

> A protective sweep is "aimed at protecting the arresting officers" and
>
> if justified by the circumstances, is nevertheless not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found. The sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises.

*Buie*, 494 U.S. at 335-36; *see also United States v. Green*, 599 F.3d 360, 376 (4th Cir. 2010). The "linchpin of the protective sweep analysis is not 'the threat posed by the arrestee, [but] the safety threat posed by the house, or more properly by unseen third parties in the house.' " *Jones*, 667 F.3d at 484 (quoting *Buie*, 494 U.S. at 336); c*f. Mora v. City of Gaithersburg*, 519 F.3d 216, 226 (4th Cir. 2008) (upholding a "preventive search" when officers "did not and could not fully know the dimensions of the threat they faced").

Applying these firmly-settled principles to the facts of this case, it is readily apparent that the officers' protective sweep of Defendant's house was constitutionally reasonable in all respects. At the pre-trial motions hearing, Defendant established that prior to the arrest the officers had no information that other individuals would be present in Defendant's house. He also established that at the time of the arrest, none of the officers saw or heard anyone else in the house. Because of this, Defendant reasons, the officers were required to immediately leave the premises once he had been arrested and hand-cuffed.

Defendant's reasoning ignores the explicit holding of *Maryland v. Buie*. There, the Court established a two-step analysis for protective sweeps. First, law enforcement officers may "as a precautionary matter *and without probable cause or reasonable suspicion*, look in closets and

other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." 494 U.S. at 334 (emphasis added). Second, officers are entitled to perform a further protective sweep of the premises when they have articulable facts which would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene. *Id.*

Defendant's argument founders on largely uncontested facts. Here, the officers engaged in *Buie*'s first step, but not the second. The officers conducted a cursory check of the rooms immediately adjoining the interior hallway where Defendant was arrested. This initial protective sweep was expressly authorized by *Buie*. Nowhere in *Buie* is there a requirement that officers must have reasonable grounds to suspect the presence of third parties before they may conduct a protective search of the spaces immediately adjoining the point of arrest. Nor does Defendant offer any other authority for such a dubious and dangerous proposition. Central to the Court's analysis is the fact that Defendant's house is very small, consisting of a single-story four-square floor plan with a small bathroom and interior hallway. Defendant was arrested near the center point of the house, that is, the interior hallway adjoining the living room, bathroom, and the two bedrooms. An attack by an unseen third party could have been immediately launched from any of the four adjoining rooms. Indeed, a person could traverse the entire width or length of Defendant's house in seconds with just a few quick strides. Moreover, the officers' sweep and Defendant's arrest were nearly simultaneous. The officers' check of the rooms was prudent, cursory, and over and done with in about two minutes. Given the Defendant's past history of violence, his evasive behavior upon the officers' arrival at the home, and the presence of a fully loaded assault weapon fitted with a large, unsheathed bayonet that was within easy reach of a

potential hidden attacker, the officers had every reason to be concerned for their safety.   In light of these facts, the officers' limited precautionary check of the spaces immediately adjoining the point of arrest was constitutionally reasonable.[4]

Accordingly, the Court **DENIES** Defendant's motion to suppress based on an alleged violation of Defendant's Fourth Amendment rights.

### B.  Motion to Dismiss Portions of the Indictment

Defendant also challenges Count Two of the Indictment on constitutional grounds.   First, he argues that these statutes unconstitutionally infringe on his Second Amendment right to self-defense in his home.   Second, he claims that 18 U.S.C. §§ 931 and 921(a)(35) are unconstitutionally vague and, thus, violate the Due Process Clause of the Fifth Amendment. Finally, Defendant maintains that Congress exceeded its authority under the Commerce Clause in enacting these statutes.   The Court rejects all three of these contentions.

### 1.  Second Amendment Challenge

Defendant challenges 18 U.S.C. §§ 931 and 921(a)(35) on Second Amendment grounds. The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.    In interpreting this text, the Supreme Court has cautioned that "[t]he Constitution was written to be understood by the voters" and its words and phrases must be understood "in their

---

4   Although not necessary to the Court's decision, the United States' alternative argument that the officers would have inevitably discovered the firearms in the safe and the bulletproof vest hanging in the second bedroom closet is meritorious.   Within seconds of Defendant's arrest, Deputy Marshal Ingram, who was standing next to Defendant at the time of the arrest, saw the assault rifle in plain view through the open door of Defendant's bedroom.   This fact alone provided the officers with probable cause for a search warrant—that is, lawful means by which the firearms in the safe and the bulletproof vest in the closet would have been discovered and would have been admissible at trial.   *See Nix v. Williams*, 467 U.S. 431, 444 (1984).

normal and ordinary as distinguished from technical meaning." *District of Columbia v. Heller*, 554 U.S. 570, 576-77 (2008) (quoting *United States v. Sprague*, 282 U.S. 716, 731 (1931)).

Defendant contends that 18 U.S.C. §§ 931 and 921(a)(35) are overbroad on their face and infringe on his fundamental right to self-defense in his own home.  (Docket 19 at 1.)  He argues that under *Heller*, "the right of the people to keep and bear Arms" under the Second Amendment extends to "body armor." (*Id.* at 8-10.)  He candidly (and correctly) acknowledges that "[t]here are no cases remotely on point in the Fourth Circuit" and that this is, thus, a case of first impression.  (*Id.* at 10.)  The United States responds that, as *Heller* made clear, an individual's Second Amendment right to keep and bear arms in not unlimited and laws, such as those that prohibit convicted felons from possessing firearms, do not unconstitutionally infringe on an individual's Second Amendment rights.  (Docket 32 at 14.)   The United States further states that no court has held that *Heller* stands for the proposition that a statute that prohibits persons convicted of violent felonies from possessing body armor unconstitutionally burdens an individual's Second Amendment rights.   (*Id.*)

In *Heller*, the Supreme Court held that the Second Amendment does not permit "the absolute prohibition of handguns held and used for self-defense in the home." *Id.* at 636.  The Court recognized, however, that, "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 626.   The Court provided a non-exhaustive list of constitutionally permissible burdens on the right: "[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626-27.

The Court recognized another limitation, namely, that the Second Amendment protects only "the sorts of weapons" that were "in common use at the time" the Second Amendment was drafted. *Id.* at 627 (quoting *United States v. Miller,* 307 U.S. 174 (1939)). By use of the phrase "sorts of weapons," the Court did not mean to limit weapons to arms only in existence in the 18th century; rather, the Court expressly stated "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* at 582.

Two years later, in *McDonald v. Chicago*, the United States Supreme Court held that the Second Amendment individual right to keep and bear arms is fully applicable to the States under the Fourteenth Amendment. *McDonald* also re-affirmed *Heller's* limitations on an individual's right to keep and bear arms:

> It is important to keep in mind that *Heller*, while striking down a law that prohibited the possession of handguns in the home, recognized that the right to keep and bear arms is not "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." 554 U.S., at ___, 128 S.Ct., at 2816. We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as "prohibitions on the possession of firearms by felons and the mentally ill. . . ." We repeat those assurances here. Despite municipal respondents' doomsday proclamations, incorporation does not imperil every law regulating firearms.

___ U.S. ___, 130 S.Ct. 3020 (2010).

In the four years since *Heller* was decided, the Fourth Circuit has embarked on the task of grinding out the finer contours of *Heller*'s analysis—chiefly in the context of statutes that penalize the possession of firearms by various categories of prohibited persons. No case, however, has addressed the question of whether a defendant who has a prior violent felony conviction has a Second Amendment right to possess body armor. *See, e.g.*, *United States v. Moore*, 666 F.3d 313,

316-17 (4th Cir. 2012) (noting circuit unanimity on the constitutionality, both in facial and as-applied contexts, of 18 U.S.C. § 921(g)(1) (felon-in-possession)); *United States v. Chapman*, 666 F.3d 220, 230-31 (4th Cir. 2012) (rejecting defendant's Second Amendment challenge to defendant's conviction under 18 U.S.C. § 922(g)(8) (possession of a firearm by a person subject to a domestic violence protective order)); *United States v. Staten*, 666 F.3d 154 (4th Cir. 2011) (rejecting defendant's Second Amendment challenge to defendant's conviction under 18 U.S.C. § 922(g)(9) (possession of a firearm by a person convicted of a misdemeanor crime of domestic violence)); *United States v. Masciandaro*, 638 F.3d 458, 474 (4th Cir. 2011) (rejecting Second Amendment challenge to defendant's conviction under 36 C.F.R. § 2.4(b) (possessing a loaded handgun in a motor vehicle within a national park area)); *United States v. Chafin*, 423 F. App'x. 342, *2 (4th Cir. 2011) (rejecting defendant's Second Amendment challenge to defendant's conviction under 18 U.S.C. § 922(d(3) (selling a firearm to a person knowing or having reasonable cause to believe that such person is an unlawful user of drugs)); *see also United States v. Chester (Chester II)*, 628 F.3d 673 (4th Cir. 2010) (holding that intermediate scrutiny governs determination whether defendant's conviction for possession of a firearm after being convicted of a misdemeanor offense of domestic violence abridged his Second Amendment right to keep and bear arms).

Similarly, no case provides the Court with any guidance as to the appropriate analytical framework to examine a novel Second Amendment claim such as is raised by Defendant here. True, in the wake of *Heller*, the Fourth Circuit has formulated an analytical framework to address constitutional challenges to *firearm* possession statutes. *See, e.g.*, *Chester II*, 628 F.3d at 678 (possession of a firearm by a domestic violence misdemeanant); *Staten*, 666 F.3d at 159 (same);

*Chapman*, 666 F.3d at 225 (possession of a firearm by a person subject to a domestic violence protective order) .   Under the *Chester II* framework, courts first ask "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *Chester II*, 628 F.3d at 678.   This is a "historical inquiry" that "seeks to determine whether the conduct at issue was understood to be within the scope of the right at the time of ratification."   *Id.* If the challenged law does not impose a burden on conduct falling within the scope of the Second Amendment's guarantee as historically understood, a court's inquiry ends.   *Id.*   If, however, the challenged law does impose a burden on conduct falling within the scope of the Second Amendment's guarantee as historically understood, then, under an intermediate scrutiny formulation, the government bears the burden of showing "a reasonable fit between the challenged regulation and a substantial government objective." *Id*. at 683 (internal quotation marks omitted). The government, however, is not required to show the regulation is "the least intrusive means of achieving the relevant government objective, or that there be no burden whatsoever on the individual right in question." *Masciandaro*, 638 F.3d at 474.

Earlier this year, in *United States v. Moore*, 666 F.3d at 318, the Fourth Circuit further refined *Chester II*'s analytical framework.   *See United States v. Smoot*, 690 F.3d 215, 221 (4th Cir. 2012) ("*Moore* refined and crystallized our approach, however, explaining that 'the *Chester* analysis is more streamlined when a presumptively lawful regulatory measure is under review.' "). In *Moore*, like many of the post-*Heller* cases, the defendant was charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g).   Moore's criminal history placed him outside the scope of Second Amendment protections for "law-abiding responsible citizens to use arms in defense of hearth and home." 666 F.3d at 319 (quoting *Heller*, 554 U.S. at 635).

14

It is unclear to this Court that this precedent, which has never been applied by the Fourth Circuit in the context of 18 U.S.C. § 931, has any application here. What is clear, at this point in the development of this nascent area of law, is that *Heller* and the Fourth Circuit firearms cases applying *Heller*, do not establish that this Defendant has a Second Amendment right to possess a bulletproof vest.

Having no authority to the contrary, this Court is skeptical that the challenged statutes—18 U.S.C. §§ 931 and 921(a)(35)—infringe upon conduct protected by the Second Amendment. Defendant's argument rests on the novel claim that the bulletproof vest that was seized from his home by the United States Marshals equates with "Arms" as that word is used in the Second Amendment. Defendant directs the Court's attention to the *Heller* Court's discussion of the meaning of "Arms." In *Heller*, the "Arm" at the center of the dispute was a firearm—a handgun. The issue addressed was whether, as the District of Columbia contended, the Second Amendment was a *collective* right and only extended to the right to possess and carry a firearm in connection with military service, or, as Heller argued, the Amendment is an *individual* right that protects a citizen's right to possess a firearm unconnected with service in a militia and to use that arm for traditionally lawful purposes, such as self-defense within the home. *Id.* at 577. Heller, of course, won. The Supreme Court concluded, among other things, that the Framers intended the word "Arms" to extend to "weapons that were not specifically designed for military use and were not employed in a military capacity" and that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* at 582.

In reaching that conclusion, the Supreme Court examined several 18th century references

to assist in interpreting the text of the Amendment as it would have been normally and ordinarily understood by citizens at the time it was drafted by the Framers.   As noted by Defendant, two of those historical references cited by the Court include defensive armor within their definitions of "arms."   The Court cites Samuel Johnson's dictionary which defines "arms" as "weapons of offense, or armour of defence."   *Id.* at 581.   Also, the Court cites Timothy Cunningham's legal dictionary which defines "arms" as "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Id.* (citing 1 A New and Complete Law Dictionary).

Yet, *Heller* did *no*t hold that "armour of defence"—whatever that may have been in the 18th century and whatever that may be now—equates with "Arms" under the Second Amendment. Rather, the Court's point in drawing on these historical reference materials was to show that the word "Arms" was not, as the District of Columbia urged, understood by the Framers to be limited to military weaponry.   As Defendant candidly acknowledges in his supplemental memorandum, the Supreme Court's ultimate conclusion was that "the most natural reading of 'keep Arms' in the Second Amendment is to 'have weapons.' "(Docket 49 at 1 (citing 554 U.S. at 582).)

It is, perhaps, notable that in *Heller* the Supreme Court used the word "weapon" as a substitute for "Arms" repeatedly throughout the opinion.   There, the word weapon is a natural synonym for the type of "Arms" at issue in that case, that is, a handgun.    However, the Court's frequent use of the word "weapon" in its historical analysis suggests that the Court construed "Arms" as instruments used *forcibly* or *affirmatively* during a confrontation—and not, as Defendant argues, those things that are merely "a passive means of self defense."   (Docket 19 at 8.)  For example, when discussing the meaning of the phrase "bear Arms," the Supreme Court

16

said the phrase "refers to carrying for a particular purpose—confrontation" and that it implies that "the carrying of the weapon is for the purpose of 'offensive or defensive action. . . .'" *Heller*, 554 U.S. 584.   The Court concluded: "Putting all of these textual elements together, we find that they guarantee the individual right to possess and carry weapons in case of confrontation." *Id.* at 592. The Court supported this conclusion with an exhaustive historical analysis canvassing numerous 18th- and early 19th-century authorities, including "the most important early American edition of Blackstone's Commentaries," which stated: "Americans understood the 'right of self-preservation' as permitting a citizen to 'repe[l] force by force' when 'the intervention of society in his behalf, may be too late to prevent an injury.' " *Id.* at 594-95 (quoting 1 Blackstone's Commentaries 145-146, n.42 (1803)).

It is also interesting that the word "weapon," as defined by one of the historical dictionaries relied upon by the Court in *Heller*, suggests that the term "weapon" in the 18th century, as now,[5] concerned instruments used *forcibly* on another person.   For example, in Samuel Johnson's *Dictionary of the English Language* defines "weapon" as an [i]nstrument of offence; something with which one is armed to hurt another.   *See* 1 *Dictionary of the English Language* (6th ed. 1785).   Similarly, Nathanial Webster's *American Dictionary of the English Language* notes that the word "weapon" "seems to be from some root signifying to strike."   Webster defined

---

5  *Webster's Third New International Dictionary* defines "weapon" as: 1) an instrument of offensive or defensive combat: something to fight with: something (as a club, sword, gun, or grenade) used in destroying, defeating, or physically injuring an enemy; something (as a club, knife, or gun) used to injure, defeat or destroy; 2) an animal's claw, teeth, talon, spur, or beak used as a means of attack; esp: the spur of a gamecock; 3) a means of contending against another . . . syn. weapon and arm indicate something used in combat as an instrument of means of attack or defense.   WEAPON applies to anything used or usable in injuring, destroying, or defending an enemy or opponent.   ARM, usu. in the plural, signifies an instrument or object designed for or used in fighting . . . but is often restricted to the class of weapons wielded by the hand and arm (as swords, pistols, or rifles).   *Webster's Third International Dictionary* (2002).

"weapon" in the first instance as "any instrument of offense; any thing used or designed to be used in destroying or annoying an enemy.   The weapons of rude nations are clubs, stones and bows and arrows.   Modern weapons of war are swords, muskets, pistols, cannon and the like."   Webster's second definition is: "An instrument for contest, or for combatting enemies. . . ."   Further down the list is the third definition: "An instrument of defense."   *See* II *American Dictionary of the English Language* (1828).

No court has examined the issue presented here: whether the Framers of the Constitution intended the Second Amendment to encompass a citizen's right to keep and bear bulletproof vests. Based on the foregoing discussion—and in the absence of any guidance from the Supreme Court or the Fourth Circuit—the Court is skeptical that the Framer's had any such thing in mind.[6]

Unaided by the dearth of any guiding authority, the Court must reject Defendant's contention that the bulletproof vest equates with "Arms" under the Second Amendment and also rejects his contention that the challenged statutes (18 U.S.C. §§ 931 and 921(a)(35)) unconstitutionally burden his Second Amendment rights.

2.    *Due Process Challenge*

Next, Defendant mounts a far less interesting, but equally unmeritorious, claim that 18 U.S.C. §§ 931 and 921(a)(35) are unconstitutionally vague.

The standards governing this inquiry are well-settled.   For a criminal statute to comply with due process, it must " 'provide adequate notice to a person of ordinary intelligence that his contemplated conduct is illegal.' " *United States v. Hsu*, 364 F.3d 192, 196 (4th Cir. 2004).

---

6 This Court views *Heller* as a welcome, if overdue, confirmation of the Second Amendment right of individuals to own or possess firearms.   However, it strikes the Court that even those who share this view would find the assertion that this right extends to body armor is, at best, a novel reach and, at worst, a potential diminution of the cherished right itself.

18

(quoting *Buckley v. Valeo*, 424 U.S. 1, 77 (1976) (per curiam)).   Claims of statutory vagueness that do not implicate the First Amendment "must be examined in the light of the facts of the case at hand."   *United States v. Sun*, 278 F.3d 302, 309 (4th Cir. 2002) (quoting *United States v. Mazurie*, 419 U.S. 544, 550 (1975)).   Thus, facial vagueness challenges to criminal statutes are allowed only when the statute implicates First Amendment rights.   *United States v. Klecker*, 348 F.3d 69, 71 (4th Cir. 2003) (citing *Sun*, 278 F.3d at 309)).   A penal statute must "define the criminal offense (1) with sufficient definiteness that ordinary people can understand what conduct is prohibited and (2) in a manner that does not encourage arbitrary and discriminatory enforcement." *Skilling v. United States*, ___ U.S. ___, 130 S.Ct. 2896, 2927 (2010) (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983) (finding that a statute requiring loiterers to provide "clear and credible" identification to police upon request held unconstitutionally vague because it failed to define "clear and credible")).   The fact that Congress might have written a statute more clearly does not make that statute unconstitutionally vague.   *United States v. Powell*, 423 U.S. 87, 94 (1975).   A "strong presumptive validity" attaches to Acts of Congress and "statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language."   *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32 (1963) (citations omitted).

In enacting 18 U.S.C. § 931, Congress provided a definition of "body armor" that is readily understandable to the ordinary person.   Section 921(a)(35) defines body armor as "any product sold or offered for sale, in interstate or foreign commerce, as personal protective body covering intended to protect against gunfire, regardless of whether the product is to be worn alone or is sold as a complement to another product or garment."   Congress enacted § 931 in response to the

19

murder of two police officers by assailants wearing protective body armor.   James Guelff and

Chris McCurley Body Armor Act of 2002, Pub. L. 107-273, § 11009, 116 Stat. 1819.   In its

legislative findings, Congress specifically noted "the serious threat to community safety posed by

criminals who wear body armor during the commission of a violent crime." *Id.*

In what appears to be a broad facial challenge to § 931, Defendant contends that

application of the statute "to someone like" Defendant for possession of "some sort of vest" fails to

advance Congress' stated purposes for the legislation because Defendant did not possess the

bulletproof vest in connection with a violent offense.   Because Defendant makes no claim that his

First Amendment rights are implicated, his facial challenge to § 931 fails.

To the extent Defendant makes an as-applied challenge, his argument reclines on an

indulgent series of hypothetical "what-ifs" that bear no connection with the facts of this case.   Not

letting the actual facts get in the way of his argument, Defendant simply ignores the fact that the

body armor found hanging in his closet was emblazoned with a prominent manufacturer's tag that

is sewn into the fabric of the vest that reads "ABA, American Body Armor & Equipment, Inc."

(Docket 39-2.)   Another tag advises the owner "[T]his armor" fully complies with certain

manufacturing standards and that the "armor" is not intended to protect against rifle fire.   Rather

than meet these facts head on, Defendant asks the Court to engage in a recreational exercise of

examining hypothetical questions such as, what is body armor under the statute?   Chain mail?   A

Kevlar vest?   A motorcycle jacket?   An army helmet?   A kabudo and bogu?   (Docket Docket

19 at 6-7.)   Given the clarity of Congress' definition of "body armor," the Court is confident that

these questions will pose little difficulty to a court addressing an as-applied challenge in a case

where a defendant is charged under § 931 with possession of Japanese weaponry or military garb.

Here, Defendant's due process argument boils down to a claim that § 931 was so indefinite that he had no way of knowing that his possession of the bulletproof vest—one that is self-described as "body armor"—was proscribed by law.   Because Defendant has a prior conviction of a crime of violence, § 931 prohibits Defendant's possession of "body armor."   The statute's definition of "body armor" plainly encompasses the bulletproof vest found hanging in Defendant's closet. Accordingly, Defendant's due process claim fails.

###### 3.   *Commerce Clause Challenge*

Defendant's final claim is that 18 U.S.C. §§ 931 and 921(a)(35) violates the Commerce Clause.   As with his other constitutional arguments, this contention has no merit.

Congress may regulate three "broad" categories of activity under its commerce power: (1) the channels of interstate commerce; (2) the instrumentalities of interstate commerce, or persons or things in interstate commerce; and (3) activities with a substantial relation to interstate commerce. *United States v. Lopez*, 514 U.S. 549, 558–59 (1995).   In *Lopez*, the Supreme Court held that the statute that made it a federal offense to possess a firearm in a school zone was unconstitutional because it did not fit within any of the three above categories and did not contain an express jurisdictional provision. *Id.* at 562 (explaining that the statute contained "no express jurisdictional element which might limit its reach to a discrete set of firearm possessions that additionally have an explicit connection with or effect on interstate commerce").

Neither the Fourth Circuit nor the Supreme Court has addressed the question of whether the body armor statute violates the Commerce Clause.   The Supreme Court and the Fourth Circuit have, however, considered and rejected Commerce Clause challenges in a closely analogous context, that is, 18 U.S.C. § 922(g)(1), the criminal statute penalizing possession of firearms by

convicted felons.   *See Scarborough v. United States*, 431 U.S. 563, 564 (1977); *United States v. Gallimore*, 247 F.3d 134, 138 (4th Cir. 2001); *United States v. Wells*, 98 F.3d 808, 811 (4th Cir. 1996) (citing cases).   These authorities hold that, because § 922(g)(1) contains an explicit jurisdictional element that requires the Government to prove that the firearm had been shipped or transported in interstate or foreign commerce, or was possessed in or affecting commerce, or was received after having been shipped or transported in interstate or foreign commerce, a constitutionally sufficient nexus exists between the firearm and interstate commerce.   *See also United States v. Cook*, No. 11-4265, 2012 WL 2899368 at *3 (3d Cir. July 17, 2012); *United States v. Harkness,* 305 F. App'x. 578, 582-83 (11th Cir. 2008) (vacated on other grounds); *United States v. Scott*, 245 F. App'x. 391393 (5th Cir. 2007); *United States v. Patton*, 451 F.3d 615, 635-36 (10th Cir. 2006).

The Court can find no principled distinction between the jurisdictional nexus contained in § 922(g) and that in § 931.   Section 931 makes it unlawful for any person previously convicted of a felony crime of violence "to purchase, own, or possess body armor." 18 U.S.C. § 931(a). "Body armor" is defined to mean " any product sold or offered for sale, in interstate or foreign commerce, as personal protective body covering intended to protect against gunfire." 18 U.S.C. § 921(a)(35). Defendant does not challenge the United States' contention that the bulletproof vest has travelled in interstate commerce. Thus, because the challenged statutes contain an express jurisdictional element, Defendant's Commerce Clause challenge fails.

### III.   CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendant's motion to suppress and dismiss

Count Two of the Indictment [Docket 19].  The Court also **DENIES** Defendant's motion to continue [Docket 56] the December 4, 2012, trial of this case because this case has been continued on Defendant's motion on three prior occasions and because Defendant has offered insufficient reasons justifying a fourth continuance in what appears to be a non-complex case.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to the Defendant and counsel, the United States Attorney, the United States Probation Office, and the United States Marshal.

ENTER:        NOVEMBER 29, 2012

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE